UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

RENE VALLECILLO                                 CIVIL ACTION NO. 6:19-cv-508

VERSUS                                          JUDGE ROBERT R. SUMMERHAYS

McDERMOTT, INC.                                 MAGISTRATE JUDGE DAVID J. AYO

## REASONS FOR JUDGMENT

This is a personal injury action brought under the Court's admiralty and maritime jurisdiction and United States general maritime law by Plaintiff, Rene Vallecillo, against his former employer, Defendant, McDermott, Inc. ("McDermott"). Vallecillo asserts claims of negligence under the general maritime law and the Jones Act, 46 U.S.C. § 30104, as well as injury resulting from the unseaworthiness of the vessel on which his injury occurred. The Court took the matter under advisement following a bench trial. After considering the trial record, the arguments of counsel, and the relevant authorities, the Court now makes the following findings of fact and conclusions of law.

### I.
### THE TRIAL RECORD AND THE COURT'S FINDINGS OF FACT

**A.    Stipulated Facts.**

Prior to trial, the parties stipulated to the following relevant facts[1]:

1) The DB50 was a vessel in navigation in the waters of the Gulf at all relevant times.

2) McDermott, Inc. was the owner and operator of DB50 at all relevant times.

3) McDermott, Inc. was responsible for the seaworthiness of DB50 at all relevant times.

4) Philip Gaudet, Robert Bardwell, Rene Vallecillo, two (2) other [unidentified Malaysian] McDermott workers, and the crawler crane operator were employees of

---

[1] ECF No. 80.

McDermott, Inc. and working aboard, and as crew members of, DB50 at the time of the subject incident.

5) Rene Vallecillo was a Jones Act seaman at all relevant times, and McDermott, Inc. was Rene Vallecillo's Jones Act employer at all relevant times.

6) Rene Vallecillo worked for McDermott, Inc. from 1989 until the subject incident.

7) Philip Gaudet was a Deck Foreman on DB50 and Rene Vallecillo's supervisor at all relevant times.

8) Robert Bardwell was a gantry crane operator on DB50 at all relevant times.

9) Rene Vallecillo was a Barge Leaderman on DB50 at all relevant times.

10) The two (2) other McDermott workers were riggers on DB50 at all relevant times.

11) The crawler crane operator was a crane operator on DB50 at all relevant times.

12) All McDermott, Inc. personnel working on DB50 possessed stop work authority at all relevant times.

13) There was an incident on DB50 on April 20, 2016 in which Rene Vallecillo suffered injuries.

14) Rene Vallecillo was diagnosed with a complex tear of the posterior horn and midbody of the medial meniscus in his right knee following the subject incident.

15) Rene Vallecillo underwent a right knee arthroscopy and meniscectomy surgery performed by Dr. Robert Lisecki on June 8, 2016.

16) Rene Vallecillo was diagnosed with ligament damage and a fracture to his right ankle following the subject incident.

17) Rene Vallecillo underwent a right ankle arthroscopy and modified Brostrom with debridement and drilling, which included the implantation of bone screws, performed by Dr. Christopher Hebert on January 31, 2017.

18) Rene Vallecillo underwent physical therapy and physical rehabilitation for his knee and ankle between May 11, 2016 and December 5, 2018

19) As a result of the subject incident, McDermott, Inc. paid $58,039 in maintenance to Rene Vallecillo and $70,320.46 to Mr. Vallecillo's medical providers for medical cure.

20) Rene Vallecillo has reached Maximum Medical Improvement ("MMI") in connection with all injuries he alleges resulted from the incident at issue.

21) McDermott has satisfied its obligations to provide maintenance and cure under the General Maritime Law.

22) Mr. Vallecillo is not claiming entitlement to punitive or exemplary damages due to any alleged failure to pay maintenance and cure, and he does not seek an award of punitive or exemplary damages.

23) Rene Vallecillo's past medical expenses that were not covered by McDermott, Inc. are $10,648.59, but McDermott, Inc.'s rights to contest causation regarding those past medical expenses are fully reserved.

24) Plaintiff's claim for past unpaid medical expenses is limited to $10,648.59, which is not subject to a reduction due to any payments made by McDermott for cure.

25) The parties agree that the amount of Mr. Vallecillo's past medical expenses, as set forth in [(23)] and [(24)] above, may be increased for any expenses for medical treatment received by Mr. Vallecillo between the submission of this Pre-trial Order and trial, to the extent it is not paid by McDermott.

26) Medical bills paid or extinguished by McDermott pursuant to its cure obligation are not recoverable as damages.

27) The total knee arthroplasty, including the custom-made knee implant and the subsequent rehabilitation, recommended for Rene Vallecillo by Dr. Robert Lisecki will cost $75,971.70, but McDermott, Inc.'s rights to contest causation regarding these alleged future medical expenses are fully reserved.

28) Plaintiff's claim for future medical expenses is not subject to a reduction due to any payments made by McDermott for cure.

29) Plaintiff's claim for past lost wages and fringe benefits is not subject to a reduction due to any payments made by McDermott for maintenance.

30) Mr. Vallecillo is not claiming a back injury, and his recent back treatment is not related to the incident at issue.

31) The parties agree to the authenticity of all certified medical records introduced as Joint Exhibits herein.

**B.    Findings Regarding How Mr. Vallecillo's Injury Occurred.**

1. Plaintiff, Rene Vallecillo, was a Jones Act seaman employed by Defendant, McDermott, Inc. ("McDermott"), for nearly thirty years and, at all times relevant, as a member of the crew of MCDERMOTT DB50 ("DB50"). Rec. Doc. 80 at p. 42.

2. DB50 is a derrick barge owned and operated by McDermott which is primarily utilized in oil and gas endeavors in waters around the world. Rec. Doc. 80, p. 42; Trial Tr. Vol. I, p. 33; Ex. J48, pp. 8-10.

3. At the time of the incident at issue, DB50 was a vessel in navigation in the Gulf performing contracted work for Chevron. Rec. Doc. 80 at p. 42.

4. Specifically, DB50's mission was to retrieve a Chevron tension leg buoy ("TBM") from the Gulf. The TBM was submerged or partially submerged approximately 220 miles south of Port Fourchon, Louisiana. DB50 was tasked with removing preinstalled equipment from the TBM and then placing the TBM onto another barge for further transportation. Trial Tr. Vol. I, pp. 35-35; Ex. J44, p. 23-24; Ex. J48, p. 10.

5. The TBMs were nearly fifty feet tall. Ex. J3; Ex. J48, p. 10.

6. Retrieving the TBM from the Gulf was not a routine occurrence, but some members of the crew of DB50 had done similar work in the past. Ex. J48, pp. 15-16. It was the first instance of such work being conducted for Chevron on this particular job. Trial Tr. Vol I., pp. 35-36.

7. The task required numerous DB50 crew members and equipment, including a gantry crane, a crawler crane, and an underwater ROV. Trial Tr. Vol I., pp. 36-37; Ex. J44, pp. 45-50; Ex. J48 pp., 9-12, 17-19.

8. McDermott's plan called for DB50's gantry crane to lower its ball/hook into the Gulf, where it would be connected by the ROV to a massive wire rope sling and shackle pre-installed on the top of the TBM. Trial Tr. Vol. I., p. 36; Ex. J44, pp. 45-50; Ex. 48, pp. 17-19.

9.  The wire rope sling and shackle were preinstalled to the TBM's topside pad and thus had been submerged or partially submerged along with the TBM. Ex. J44, pp. 46-47; Ex. J48, pp. 17-18.

10. The shackle which eventually became stuck was attached to a recovery sling that was approximately forty (40) feet long. Trial Tr. Vol. II, pp. 276-77.

11. After connecting the gantry crane to the wire rope slings, the gantry crane operator was tasked with utilizing the crane to lift the TBM out of the Gulf and set it onto DB50's deck. Trial Tr. Vol. I, pp. 36-37; Ex. J44, pp. 47-48; Ex. J48, pp. 17-19.

12. Next, DB50's crawler crane was to transport multiple crew members onto the top of the TBM via a work basket. Crane transport was the only way for the crew to get onto the top of the TBM. Trial Tr. Vol. I, p. 38; Ex. J44, pp. 48-49; Ex. J48, pp. 21-22.

13. The TBM is cylindrical, and its top features a handrail encircling the perimeter, with a gap about 3 feet wide in which there is no floor or handrail. The TBM has a total width of approximately 25 feet, resulting in a radius of approximately 12.5 feet. However, the distance between the equipment in the center of the TBM and the perimeter handrail—i.e., the width of the donut-shaped area in which crewmembers can effectively work on top of the TBM—appears to be approximately seven feet. Trial Tr. Vol. II., pp. 187-88, 272-74, 426; Ex. J49.

14. Crew members on top of the TBM were equipped with personal protective equipment including a safety harness and a fall protection/safety lanyard. Given the height of the TBM, crew members would be required to keep their lanyards attached to stable attachment points on the TBM at all times, in case of a fall. The plan then called for crew members to work with the gantry crane operator to detach and de-rig several pre-installed items from

the top of the TBM. Trial Tr. Vol. I, pp. 37, 68-69; Ex. J44, pp. 49-50; Ex. J48, pp. 17-19, 21-22.

15. The operation required crew members to detach the pre-installed shackle and sling from the TBM. This would allow the gantry crane to lift the sling and shackle off the TBM and set them down onto DB50's deck. Ex. J44, pp. 49-50; Ex. J48, pp. 17-19, 21-22.

16. Next, the crew members would install new slings and shackles on the top of the TBM and attach them to the gantry crane's block or hook. The crew members would then be removed from the top of the TBM by the crawler crane, and the gantry crane would move the TBM from DB50's deck to the transport barge. Ex. J44, pp. 58-59.

17. The crew, including Mr. Vallecillo, had performed similar operations on a prior McDermott job in Brazil, without any incident or issues. See Trial Tr. Vol. II pp. 229-30; Ex. J48, pp. 65-66.

18. Vallecillo was the Barge Leaderman on the job at issue and was in charge of the other crew members involved with the operation, namely two unidentified Malaysian riggers and Bardwell, the gantry crane operator. Trial Tr. Vol. II. p. 107; Ex. J48, pp. 11-12, 23-25, 55-58, 72, 84.

19. Gaudet was McDermott's deck foreman and lifting authority, and in that capacity supervised all leadermen, crane operators, and riggers working on DB50. Trial Tr. Vol. I-II, pp. 33-35, 123, 231; Ex. J48, pp. 35-36.

20. Despite Gaudet's ultimate responsibility for certain aspects of the work being done, as McDermott's representative on the vessel, Vallecillo was in charge of the specific manner in which the old slings and shackles were removed from the TBM and the new slings and shackles were installed. Gaudet was on the deck of DB50 at all relevant times and could

not see what was happening on top of the TBM. Trial Tr. Vol. I-II, pp. 35, 183, 231, 435; Ex. J48, pp. 24-25, 34-35, 55-56, 84-85; Ex. P8, p. 35.

21. Gaudet organized the team to carry out the TBM lifting and rigging job: Bardwell to operate the gantry crane, Gentry to operate the crawler crane, and Vallecillo and two Malaysian employees to conduct the derigging and rigging operations. Trial Tr. Vol. I-II, pp. 35, 107, 183, 185; Ex. J44, pp. 45-50; Ex. J48, pp. 11-12.

22. Gaudet did not inspect or analyze the top of the TBM, or the length of the relevant slings, prior to ordering the men to perform this task. Trial Tr. Vol. I, pp. 38-39.

23. Each crew member, including Vallecillo, was well trained in stop work authority. Trial Tr. Vol. I-II, pp. 92, 211, 424-25.

24. Each crew member, including Vallecillo, was well trained in connection with and responsible for where he tied off his own fall protection lanyards. Trial Tr. Vol. I-II, pp. 109-11, 419-24; Ex. J9; Ex. J48, pp. 42-43, 52-53.

25. Standards and regulations in McDermott's industry require that crew members conduct meetings before an operation to review job safety, including anticipating the hazards that could be presented by the operation and reviewing how crew members can mitigate those risks if they arise. If the crew, during the operation, encounters a hazard that was not discussed at a safety meeting or in a safety analysis, work is supposed to stop until the crew can decide how to move forward safely. Trial Tr. Vol. II, pp. 290-91.

26. Hazard Identification Tool ("HIT") cards suggest that some level of safety meetings— though abbreviated—were conducted on and before the date of the incident, including one meeting led by Vallecillo. However, Vallecillo testified that no Job Safety Analysis ("JSA") meeting—a more rigorous type of safety meeting than a HIT card review—was

conducted. McDermott's corporate representative testified he was not aware of any documentation of a JSA meeting being held prior to the operation, and that such documentation would ordinarily have been retained. Trial Tr. Vol. I-II, pp. 109-11, 123-24, 185. The HIT cards completed prior to the incident do not indicate that any discussions were had regarding what to do in the event of a stuck shackle. Ex. J46; Ex. J48, pp. 59-64.

27. The relevant work began after the gantry crane's ball/hook was lowered into the Gulf and connected to the TBM's recovery sling/shackle by the underwater ROV, and the TBM was lifted out of the Gulf and set onto DB50's deck. Trial Tr. Vol. II pp. 229-30; Ex. J48, pp. 17-19.

28. Gentry then transported Vallecillo, the other two riggers, and their equipment (i.e., pry bars, sledgehammer, and PPE) from DB50's deck onto the top of the TBM via a work basket. Trial Tr. Vol I-II, pp. 75, 185-85; Ex. J44, pp. 48-49; Ex. J48, pp. 21-22.

29. The crew removed the smaller shackles and slings by pulling the shackle pins, removing the shackles, and replacing the pins into the freed shackles. Trial Tr. Vol. II, pp. 190-91.

30. The crew then attempted to disconnect the wire rope sling and shackle from the TBM. They were able to remove the massive shackle's pin by unscrewing the pin's nut and sliding the pin out. However, the crew was unable to free the shackle from the TBM's pad-eye. Trial Tr. Vol. II, pp. 190-91, 338-39; Ex. J44, pp. 55, 60.

31. Vallecillo and the Malaysian employees unsuccessfully attempted to free the stuck shackle with pry bars and sledgehammers for approximately thirty minutes. Trial Tr. Vol. II, pp. 191-92; Ex. J48, p. 28.

32. At that point, Vallecillo notified Gaudet and Bardwell via radio of the stuck shackle. Trial Tr. Vol. I-II, pp. 42, 192-94; Ex. J48, pp. 26-27. Gaudet and Bardwell did not clearly recall

being notified about a stuck shackle, but acknowledged that stuck shackles are not uncommon in the kind of work being done. Ex. D1; Ex. J48 at 71.

33. Bardwell testified that he was seated in the gantry crane cab during this operation, approximately 100 feet from the top of TBM, and was able to observe the crew members during their attempts to free the shackle. Trial Tr. Vol. I-II, pp. 49, 240; Ex. J48, pp. 11, 12, 27-28, 56.

34. After previous attempts proved unsuccessful, Vallecillo decided to use the gantry crane to lift the sling and shackle to break the shackle free from the pad-eye. Vallecillo and Bardwell testified this use of a crane was not unusual to address a stuck shackle when the other means employed by Vallecillo and the two riggers did not work. McDermott's liability expert, Mr. Gee, agreed that such use of a gantry crane was "accepted practice on DB50." Trial Tr. Vol. I-II, pp. 40-41, 192, 259-60, 434; Ex. J48, p. 41.

35. Vallecillo and his fellow crew members stepped back to the TBM's handrail, which was the farthest they could move away on top of the TBM. Trial Tr. Vol. II, pp. 194, 292-93; Ex. J48, p. 22; Ex. J50.

36. Bardwell then lifted up on the sling with the gantry crane in an attempt to break the shackle free. Trial Tr. Vol. II, p. 196; Ex. J48, pp. 28-29.

37. As Bardwell lifted with the gantry crane, the shackle broke free from the TBM's pad eye in an uncontrolled manner. Trial Tr. Vol. II, p. 196; Ex. J44, p. 72; Ex. J48, p. 12-13.

38. The shackle and sling swung and spun violently toward Vallecillo and struck his safety lanyard. Trial Tr. Vol. I-II, pp. 48, 93, 196; Ex. J48, p. 12-13.

39. The impact with his lanyard pulled Vallecillo down onto the top of the TBM, causing injury to his knee and ankle. Trial Tr. Vol. II, p. 196; Ex. J48, pp. 12-13; Rec. Doc. 80, p. 42.

40. Once Vallecillo returned to the deck of DB50, he informed Gaudet about his injuries and reported to the medic. Trial Tr. Vol. II, pp. 197-98; Ex. J4, p. 7.

41. While on DB50, Vallecillo was given Ibuprofen and was released. His hitch ended later that evening, and he was transported back to land the following day. Trial Tr. Vol. II, p. 198; Ex. J4, p. 7; Rec. Doc. 80, pp. 42-43.

42. McDermott considered Vallecillo to be a good, reliable and safe worker. Trial Tr. Vol. I-II, pp. 98, 105, 218-22.

43. Vallecillo, Bardwell and Gaudet all believed the work being performed at the time of the incident was being performed safely. Trial Tr. Vol. I-II, pp. 65-66, 196-97, 259, 275-76, 309-10; Ex. J48, p. 44-45, 73.

44. All crew members, including Vallecillo, had stop work authority and could have exercised it at any time, but none did. McDermott's liability expert, Mr. Gee, agreed that Vallecillo, Bardwell, and the two Malaysian riggers each should have exercised stop work authority, once they knew that the shackle was stuck. Trial Tr. Vol. I-II, pp. 16, 92, 435-37; Ex. J48, pp. 43-44, 73.

45. Vallecillo testified that, based on his experience with McDermott, he did not think any McDermott employee had done anything wrong in connection with the incident. However, he testified that he received no training from McDermott on how to safely resolve a stuck shackle. Trial Tr. Vol. II, p. 245-46.

46. McDermott, supported by the opinion of its liability expert, Martin Gee, argued that Mr. Vallecillo's own negligence was the only cause of the incident because Mr. Vallecillo was trained and experienced, had encountered stuck shackles in the past, was in the best position to determine how to deal with this particular stuck shackle, and placed his safety

lanyard improperly. Trial Tr. Vol. I-II, pp. 105-06, 120, 211-16, 218-22, 240-41, 246, 312, 320, 324-25; 411-56; Ex. J48, pp. 11, 56-57.

47. A report commissioned by McDermott after the incident recommended that in the future, riggers should install additional restraints to control rigging, if needed, and personnel should be moved off of the top of a buoy before using a crane to remove a stuck shackle. Ex. J4. However, McDermott argues that their policies have not been changed to adopt those recommendations, and Mr. Gee testified that it would not be advisable to remove personnel from a buoy before using a crane to remove a stuck shackle due to the increased risk. See Trial Tr. Vol. II, pp. 430-31.

## C.    **Findings Regarding Medical Treatment.**

1. On April 27, 2016, Vallecillo reported to his primary care physician, Dr. Angie Langlinais, because the pain and swelling in his knee and ankle would not subside. Trial Tr. Vol. II, p. 199; Ex. P1, p. 1; Ex. J22.

2. On April 28, 2016, Vallecillo reported to Occupational Medicine Clinic with the same pain complaints. He was diagnosed with right knee and ankle sprain and left elbow bruise. He was referred for an MRI of his right knee and prescribed two weeks of physical therapy for his knee and ankle. He was given crutches and advised that he could not be approved to return to work. Ex. P1, pp. 1-3; Ex. J23.

3. On May 11, 2016, Vallecillo presented to Acadian Comprehensive Therapy Services to begin his physical therapy. Ex. P1, pp. 3-5; Ex. J25.

4. On May 12, 2016, Vallecillo underwent an MRI of his injured knee at Imaging at Lafayette Surgical Specialty Hospital, which revealed a complex tear of the posterior horn and midbody of the medial meniscus. Ex. P1, p. 6; Ex. J30.

5.  On May 17, 2016, Vallecillo was treated by Dr. Robert Lisecki of the Ortho Clinic for the torn meniscus following a referral from OMC. Trial Tr. Vol. I, p. 140; Ex. P1, pp. 7-9; Ex. J20.

6.  After reviewing the imaging studies and examining Vallecillo, Dr. Lisecki concluded that Vallecillo was a candidate for arthroscopic knee surgery because he had suffered a complex tear of the medial meniscus. Trial Tr. Vol I, p. 140; Ex. P1, pp. 7-9; Ex. J20.

7.  On June 8, 2016, Dr. Lisecki performed a right knee arthroscopy and meniscectomy. Trial Tr. Vol. I, p. 141; Ex. P1, p. 14-15; Ex. J20; Ex. J27.

8.  Following the surgery, Vallecillo underwent approximately four months of physical therapy at Acadian Comprehensive Therapy services, which included 51 visits, pursuant to Dr. Lisecki's prescriptions. Trial Tr. Vol. I, p. 245; Ex. P1, p. 17-50; Ex. J20; Ex. J25.

9.  On July 1, 2016, Vallecillo underwent an MRI of his right ankle at Envision Imaging due to persisting complaints. The imaging revealed, in part, a high ankle sprain, torn anterior and posterior tibiofibular ligaments, and a partially detached chondral fragment on the talar dome. Ex. P1, p. 25; Ex. J31; Ex. J39, pp. 17-20.

10. Vallecillo continued physical therapy for his knee and ankle at Acadian Comprehensive Therapy Services through October 5, 2016, pursuant to Dr. Lisecki's prescriptions. Trial Tr. Vol. I., pp. 142-43; Ex. P1, pp. 17-50; Ex. J25.

11. On January 11, 2017 and on Dr. Lisecki's referral, Vallecillo was examined by foot and ankle specialist Dr. Christopher Hebert, for continued complaints of pain and instability in his right ankle. Trial. Tr. Vol. I, p. 145; Ex. P1, pp. 53-55; Ex. J21.

12. Dr. Hebert determined that surgery was required to address Vallecillo's right ankle injuries. Ex. P1, pp. 53-55; Ex. J21; Ex. J39, pp. 17-20.

13. On January 31, 2017, Dr. Hebert performed a right ankle arthroscopy and modified Brostrom with debridement and drilling, which included the permanent implantation of bone screws. Ex. P1, pp. 56-59; Ex. J21; Ex. J28; Ex. J39, pp. 17-20.

14. Following the surgery, Dr. Hebert instructed Vallecillo to remain non-weightbearing on his surgically repaired ankle and to continue to use his bone stimulator because of prolonged healing of the fracture. Ex. P1, p. 59; Ex. J28.

15. In June 2017, five months post ankle surgery, Dr. Hebert's examination revealed improved stability in the right ankle, but the fracture with nonunion of the medial malleolar osteotomy had not changed. Dr. Hebert advised Vallecillo to wear an ankle brace and follow up in six weeks. Ex. P1, p. 63; Ex. J21.

16. On August 14, 2017, Dr. Hebert noted possible improvement of the nonunion but that it had not fully healed. He advised Vallecillo to continue using the bone stimulator and follow up in 6-8 weeks. Ex. P1, pp. 66-67; Ex. J21; Ex. J39, pp. 42-43.

17. On September 25, 2017, after a new course of physical therapy, Vallecillo returned to Dr. Hebert and indicated an improvement in his ankle pain, but he still had anterior lateral pain and had trouble with prolonged standing. Ex. P1, pp. 74-75; Ex. J21.

18. On November 27, 2017, Vallecillo returned to Dr. Hebert with continued similar complaints. Dr. Hebert noted Vallecillo remained symptomatic with the medial nonunion fracture and that standing creates his pain symptoms. Dr. Hebert thought Vallecillo's ankle had reached maximum medical improvement (MMI) and that Vallecillo had a permanent impairment including loss of motion, as well as weakness and stiffness of the ankle joint. Dr. Hebert opined that Vallecillo could not return to his previous level of employment. Ex. P1, pp. 81-82; Ex. J21; Ex. J39, pp. 15, 24-26, 44-45.

19. In November 2017, Dr. Hebert also discussed the possibility of a second ankle surgery. This surgery would have been intended to lessen the pain in the joint, and would not have affected its function. Vallecillo declined to have the second surgery, and Dr. Hebert testified that Vallecillo's pain ultimately resolved sufficiently that the second surgery was no longer warranted. Ex. J39, pp. 30-31.

20. In January 2018, Vallecillo received a functional capacity evaluation from Iberia Physical Therapy but the evaluation was not completed due to Vallecillo's elevated blood pressure. Trial Tr. Vol. II, pp. 203-04; Ex. P1, p. 82; Ex. J22; Ex. J39, p. 29.

21. On January 15, 2018, Vallecillo saw Dr. Langlinais for an evaluation of his blood pressure, and he received clearance to undergo the functional capacity evaluation. Trial Tr. Vol. II, pp. 203-04; Ex. P1, p. 82; Ex. J22.

22. Vallecillo attempted to reschedule the functional capacity evaluation shortly after this evaluation, but it was not conducted at that time. Trial Tr. Vol. II, pp. 203-04; Ex. J21; Ex. J39, pp. 8-9.

23. On August 21, 2018, Vallecillo saw Dr. Lisecki for a follow-up because of continued complaints of pain and clicking in his surgically repaired knee. Dr. Lisecki indicated that Vallecillo's pain complaints were consistent with traumatic arthritis and ordered physical therapy and an MRI of the right knee. Trial Tr. Vol. I, pp. 141-43; Ex. P1, pp. 83-85; Ex. J26.

24. On October 23, 2018, Vallecillo underwent an MRI of his right knee at Acadiana MRI. The imaging revealed a tear/deformity in the medial meniscus. Ex. P1, p. 91; Ex. J32.

25. On October 30, 2018, Vallecillo returned to Dr. Lisecki for a review of the MRI study. Dr. Lisecki noted that the arthritis in Vallecillo's right knee was accelerating, likely due to his

injury, and scheduled Vallecillo for a series of injections to his knee. Trial Tr. Vol. I, pp. 143-44; Ex. P1, pp. 91-92; Ex. J20.

26. In November and December 2018, Vallecillo underwent a series of three Genvisc injections in his right knee to address the accelerated arthritis. The injection in total provided approximately four months of relief. Trial Tr. Vol. I, pp. 138-44; Ex. P1, pp. 95-98; Ex. J20.

27. On May 14, 2019, Vallecillo returned to Dr. Lisecki with complaints of anterior knee pain with squatting and a clicking noise in his knee. Dr. Lisecki recommended a steroid injection. Ex. P1, p. 99; Ex. J20.

28. On June 18, 2019, Vallecillo returned for a follow-up with Dr. Lisecki with continued complaints of instability in his knee when squatting and a clicking noise in his knee. Dr. Lisecki recommended an injection of Zilretta, a long-acting pain medication. Ex. P1, pp. 99-100; Ex. J20.

29. On May 11, 2021, Vallecillo was involved in a motor vehicle accident and was treated at the Iberia Medical Center Emergency Room on the same day; the evidence in the record indicates that his air bags deployed in the accident. He was diagnosed with musculoskeletal pain and discharged with muscle relaxers. Vallecillo's vehicle was totaled as a result of the accident. Vallecillo did not report this motor vehicle accident to his treating physicians. Trial Tr. Vol. II, pp. 249-52; J29; Ex. J39, pp. 50-51.

30. On September 2, 2021, Vallecillo returned to Dr. Lisecki with persistent pain and stiffness in his right knee. Dr. Lisecki noted that Mr. Vallecillo would probably need knee replacement in the future. Trial Tr. Vol. I, pp. 139, 145-47; Ex. P1, pp. 100-01; Ex. J20.

31. Dr. Lisecki recommended additional injections and prescribed a topical gel to relieve the knee pain before a knee replacement could be performed. Ex. P1, pp. 100-01; Ex. J20.

32. In December 2021, Vallecillo saw Dr. Lisecki three times for three rounds of TriVisc injections in his right knee. Trial Tr. Vol. I, pp. 138, 143-44; Ex. P1, p. 102; Ex. J20.

33. On March 22, 2022, Vallecillo saw Dr. Lisecki for a follow-up and complained of pain in his right knee despite the TriVisc injections. Dr. Lisecki prescribed a topical pain relief gel and discussed potentially another set of knee injections. Trial Tr. Vol. I, pp. 138, 143-44; Ex. P1, p. 103; Ex. J20.

34. On May 24, 2022, Vallecillo returned to Dr. Lisecki with similar complaints. Dr. Lisecki believed Vallecillo may have re-torn his medial meniscus in the posterior horn are and requested a new MRI. Dr. Lisecki did not believe additional injections would be beneficial at that time. Trial Tr. Vol. I, pp. 138, 143-44; Ex. P1, p. 104-05; Ex. J20.

35. On July 25, 2022, Vallecillo underwent an MRI of his right knee which showed small nonspecific joint effusion. Ex. P1, p. 105; Ex. J32.

36. On February 28, 2023, Vallecillo returned to Dr. Lisecki to discuss the MRI findings of his right knee. Ex. P1, pp. 105-06; Ex. J20.

37. On June 26, 2023, Vallecillo returned to Dr. Hebert for right foot pain. Dr. Hebert gave him steroid injections to his right ankle and gave him a brace for his ankle. Dr. Hebert also ordered a Functional Capacity Evaluation. Trial Tr. Vol. II, pp. 163-64; Ex. J39, pp. 24, 33-34; Ex. P1, pp. 106-08; Ex. J21.

38. On August 4, 2023, Vallecillo underwent a Functional Capacity Evaluation with Scott Clark, DC and Roxanne Clark, OT at Clark Integrated Medical Clinic. Vallecillo reported he had fallen in his kitchen two years prior to the examination. The examiners opined that

Vallecillo was unable to work offshore. Dr. Clark was not asked whether Mr. Vallecillo could return to some other type of employment and has testified he likely could work in some other capacity. Trial Tr. Vol. II, pp. 160-68; Ex. P1, pp. 108-11; Ex. J41.

39. Dr. Lisecki opined that, more likely than not, Vallecillo will require a total knee arthroplasty in the future as a result of the subject incident. Trial Tr. Vol. I, pp. 139, 145-47.

40. The parties stipulated that the total knee arthroplasty, including the custom-made knee implant and the subsequent rehabilitation, will cost $75,971.70. Rec. Doc. 80, p. 42; Trial Tr. Vol. I, pp. 145-46.

**D.    Findings Regarding Economic Damages and Medical Expenses.**

1. The total past and future medical expenses amount to $156,940.75. Vallecillo does not claim any entitlement to damages for past medical expenses of $70,320.46 paid by McDermott pursuant to its obligations to furnish medical cure. Rec. Doc. 80, p. 43.

2. The parties have stipulated that Vallecillo's recoverable past medical expenses in the event of a finding of medical causation for such expenses is $10,648.59, which is inclusive of amounts paid or owed by or on behalf of Vallecillo, independent of any payments made by McDermott. Rec. Doc. 80, p. 43.

3. The parties have stipulated that Vallecillo's recoverable future medical expenses in the event of a finding of medical causation for such expenses is $75,971.70. Rec. Doc. 80, p. 44.

4. As to limitations on Vallecillo's ability to work and past lost wages, Dr. Hebert opined in November 27, 2017 that Vallecillo's ankle had reached MMI but that Vallecillo would suffer from permanent impairment in the joint, including loss of motion, weakness, and

stiffness. Dr. Hebert further opined that Vallecillo would not be able to return to his previous strenuous level of employment as a barge leaderman. Ex. J21, pp. 24, 44; Ex. J39, pp. 24-26, 44-47.

5. Vallecillo testified that he only rarely uses a cane to walk, but his knee still makes it difficult or impossible for him to squat. Dr. Scott Clark opined that Vallecillo had no limitations regarding his upper body. Dr. Lisecki testified that in September, 2018 he did not believe Vallecillo was disabled by the status of his right knee, but after hearing testimony at trial, he also did not believe Vallecillo would have been able to return to work as a barge leaderman at any point. Trial Tr. Vol. I-II, pp. 149-50, 170, 249-50.

6. While Dr. Lisecki told Vallecillo he could return to work in a light duty position in September 2016, just five months after the incident, Vallecillo testified that he did not try to find light-duty work because he was still employed by McDermott and he believed— presumably through his long experience with the company—that it did not have any light duty positions available, at least in its offshore operations. Trial Tr. Vol. II, pp. 248-49. McDermott pointed out in post-trial briefing that Vallecillo did not ask about the availability of light duty work, but offered no evidence that such work was available with McDermott, whether Vallecillo might have been qualified for it, or what compensation it might have offered.

## E.   **Findings Regarding General Damages.**

1. Vallecillo is unable to squat due to his knee injury and experiences severe ankle pain at times, necessitating the use of over-the-counter pain medication. He also testified that living with persistent pain has impacted his daily life and well-being. Trial Tr. Vol. II, pp. 202-07.

2. Vallecillo experiences persistent numbness in his right leg, eventually rendering him unable to operate a vehicle. Trial Tr. Vol. II, pp. 475-76.

3. Vallecillo and his wife, Judy Vallecillo, testified that the loss of his career and mobility, and his feelings of dissatisfaction with how McDermott responded to his injury and medical needs, has caused him emotional distress. Trial Tr. Vol. II, pp. 180-81, 260-61, 352.

4. Judy Vallecillo testified that her husband's life and personality have been substantially altered by the injury. For example, prior to the injury, Vallecillo was highly active and independent, regularly mowed their approximately one-acre lawn with a push lawnmower, and generally maintained a positive, cheerful, and joyful demeanor. Since the injury, he can no longer complete daily chores and tasks, or they take much longer due to his pain or to his right leg being unable to support him at all. Vallecillo has also become often temperamental and "grouchy," and this shift in personality has been distressing for his family. Trial Tr. Vol. II, pp. 347-52.

5. Dr. Lisecki also testified that the injury has caused Vallecillo to experience traumatic arthritis in his right knee, which will progressively worsen over time. While the severity and rate of progression are unpredictable, the condition of Vallecillo's knee will deteriorate and will cause further pain going forward. Trial Tr. Vol. I, pp. 141-47.

6. Vallecillo has required knee injections for temporary relief since the injury and may require them for the rest of his life. Trial Tr. Vol. I, pp. 141-47.

7. Dr. Lisecki testified that more probably than not, Vallecillo will eventually need to undergo a total knee replacement due to meniscus damage caused by the incident, and that this surgery is "the most painful procedure that is done." Trial Tr. Vol. I, pp. 139, 145-46.

8. Dr. Hebert also testified about the significant pain and suffering Vallecillo has experienced and will continue to endure due to his ankle injury. While ankle surgery was necessary and improved Vallecillo's condition, Dr. Hebert expects Vallecillo will have pain and instability in the joint for the foreseeable future. Vallecillo will likely require injections for his ankle as well, which will provide temporary relief but not resolve the symptoms entirely. Ex. J39, pp. 17-23, 33-34.

## II.
### CONCLUSIONS OF LAW

**A.    Jones Act Negligence.**

"A seaman is entitled to recovery under the Jones Act … if his employer's negligence is the cause, in whole or in part, of his injury." *Quach v. St. Martin VI, LLC*, No. 6:19-CV-01442, 2024 WL 1654925, at *1 n.13 (W.D. La. Apr. 17, 2024)(quoting *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997))(quotations omitted). With respect to causation, "a defendant must bear responsibility for his negligence if his negligence played any part, even the slightest, in producing the injury" for which damages are sought. *Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 302 (5th Cir. 1984)(citations omitted). Negligence under the Jones Act may include "the failure to use reasonable care to provide a seaman with a reasonably safe place to work, the existence of a dangerous condition on or about the vessel, failure to inspect the vessel for hazards, failure to take precautions to protect a seaman, or any other breach of the duty of care." *Davis v. Hill Engineering, Inc*., 549 F.2d 314, 329 (5th Cir. 1977), *overruled on other grounds by Gautreaux*, 107 F.3d at 339; Thomas J. Schoenbaum, Admiralty and Maritime Law, § 6:21 (6th Ed.). "A Jones Act employer is attributed the standard of care of ordinary prudence under the circumstances and owes its seamen a duty to provide a safe place to work." *Williams v. Sea Support Ventures LLC*, 708 F. Supp. 3d 813, 818 (E.D. La. 2023)(quoting *Gautreaux*, 107 F.3d at

338)(quotations omitted). While "the employer must have notice and the opportunity to correct an unsafe condition before liability attaches … the standard of care is not 'what the employer subjectively knew, but rather what it objectively knew or should have known.'" *Semien v. Parker Drilling Offshore USA LLC*, 179 F. Supp. 3d 687, 695 (W.D. La. 2016)(quoting *Colburn v. Bunge Towing, Inc*., 883 F.2d 372, 374 (5th Cir.1989)). A Jones Act employer is legally responsible for the negligence of its employees, provided the negligent employee is acting within the course and scope of his or her employment. 46 U.S.C. § 30104(a) (extending the protections of the Federal Employer's Liability Act to seamen); 46 U.S.C. § 51 ("Every common carrier by railroad ... shall be liable in damages … for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier ….") (emphasis added); see also *Beech v. Hercules Drilling Co., LLC*, 691 F.3d 566, 571 (5th Cir. 2012).

"[C]ontributory negligence is an affirmative defense that diminishes recovery in proportion to the seaman's fault." *Johnson v. Cenac Towing, Inc*., 544 F.3d 296, 302 (5th Cir. 2008)(*citing* 45 U.S.C. § 53; *Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158, 127 S.Ct. 799, 802, 166 L.Ed.2d 638 (2007)). An employer must prove negligence and causation in order to show that a plaintiff was contributorily negligent. *Id.* (*citing Norfolk*, 127 S.Ct. at 807; Gautreaux, 107 F.3d at 338). A seaman is subject to the same negligence standard as his employer, meaning that he is negligent "if he fails to act with ordinary prudence under the circumstances." *Id.* "The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard, therefore, [in] a Jones Act negligence action becomes one of the reasonable seaman in like circumstances." *Id.* The standard of causation for contributory negligence in Jones Act cases is not demanding—an employer must show that a seaman's negligence "played any part, even the

slightest, in producing the injury." *Id.* (quoting *Chisholm v. Sabine Towing & Transp. Co., Inc.,* 679 F.2d 60, 62 (5th Cir.1982)). "Even under the Jones Act, however, a party must establish more than mere 'but for' causation." *Id.* (citing *Gavagan v. United States*, 955 F.2d 1016, 1019–20 (5th Cir.1992)).

**B.    Unseaworthiness.**

   "General maritime law imposes a duty upon shipowners to provide a seaworthy vessel." *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020)(quoting *Hlodan v. Ohio Barge Line, Inc.*, 611 F.2d 71, 74 (5th Cir. 1980)). "To be seaworthy, a vessel and its appurtenances must be reasonably fit for their intended uses." *Id.* (quoting *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 379 (5th Cir. 2012)). "A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage might be improper." *Ainsworth v. Caillou Island Towing Co.*, No. CIV.A. 13-0688, 2013 WL 6044376, at *3 (E.D. La. Nov. 14, 2013)(quoting *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499–50 (1971)). "[A] vessel may be unseaworthy if an unsafe method of work is used to perform vessel services." *Id.* (citing *Rogers v. Eagle Offshore Drilling Services, Inc.*, 764 F.2d 300, 303 (5th Cir.1985)). "[A] plaintiff must present sufficient evidence to raise a … question whether a method of operation is unsafe, before a fully equipped vessel, with all its gear in good working order, can be rendered unseaworthy" and "the mere fact that an alternative method is available does not render a vessel unseaworthy." *Rogers v. Eagle Offshore Drilling Servs., Inc.*, 764 F.2d 300, 304 (5th Cir. 1985)(citation omitted). "Liability under the doctrine of unseaworthiness does not rest upon fault or negligence," but rather "a plaintiff must prove that the unseaworthy condition played a

substantial part in bringing about or actually causing [an] injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Luwisch*, 956 F.3d at 326 (quoting *Johnson v. Offshore Express, Inc*., 845 F.2d 1347, 1354 (5th Cir. 1988)).

Under the Jones Act and the general maritime law, an injured plaintiff must take reasonable steps to mitigate his damages. *Williams v. Reading & Bates Drilling Co*., 750 F.2d 487, 490 (5th Cir. 1985). Proving failure to mitigate damages is the burden of the defendant. *Blaauw v. Superior Offshore Int'l, LLC*, No. CIV. 06-1380, 2008 WL 4224808, at *15 (W.D. La. Sept. 10, 2008)(citing *Kratzer v. Capitol Marine Supply, Inc*., 645 F.2d 477, 483 (5th Cir.1981)).

### III.
### APPLICATION OF FACTUAL FINDINGS TO THE LAW

#### A.    Jones Act Negligence.

The Court finds McDermott negligently failed to take precautions to protect Vallecillo and the other crewmembers of DB50 from the risks presented by using a crane to free an unsecured stuck shackle. Specifically, the Court finds that the use of a crane to pull on a sling and stuck shackle created unknown forces that would cause the shackle to behave in unpredictable ways if and when it broke free from the pad-eye if proper precautions were not undertaken. Unpredictable behavior by the kind of heavy equipment involved in the lift and/or rigging job at issue here created serious risks to the health and safety of the crewmembers on top of the TBM which would have been apprehensible through the use of ordinary prudence under the circumstances by an experienced seaman. The risks were heightened by the size of the space in which the work was done. While not a confined space under statute or regulation, the recovery sling attached the shackle was approximately forty feet long and the width of the area the crewmembers had to work

was either seven or twelve feet—if the shackle broke free under tension, the record shows there would have been no safe space on top of the TBM.

The record showed that the risk could have been mitigated, however, by using additional lines to secure the sling and/or shackle before using the crane to lift the sling, which was not done. The crew could also have been removed from the top of the TBM prior to lifting the sling. That procedure would have eliminated the risk presented by a tensioned shackle, but McDermott's expert opined that it would have created different, potentially inadvisable, hazards.

Witnesses for both parties testified that encountering a stuck shackle of the kind on top of the TBM is not uncommon in McDermott's industry, and that using a crane is an accepted, if not common, way to free a stuck shackle. McDermott employees, including Vallecillo, testified that using a crane was one of the "standard" ways they dealt with shackles that did not respond to other attempts to break them free, and McDermott's expert testified to have seen it done himself. Therefore, the fact that DB50's crewmembers believed they were taking proper action in response to the stuck shackle indicates that McDermott's training and safety procedures were deficient with regard to how to address a common occurrence in the field.

McDermott argues that, as the person in charge of the job, Vallecillo bears sole responsibility for any decisions made during the course of the job and any consequences resulting from those decisions. It argues that, as an experienced seaman, Vallecillo should have realized the dangers inherent in the decisions that he made. But this argument ignores Vallecillo's long tenure with McDermott and the fact that his experience was shaped by the company's procedures, policies, and training. Under the Jones Act, McDermott has obligations to protect its employees from certain foreseeable and avoidable risks and to train them on how to operate in a safe manner. That the record reflects no training or policies on how to engage a stuck shackle safely indicates

that this situation presented a gap in McDermott's training and policies. The record reflects that the lack of such policies and training—regarding what the parties agree is a not-uncommon occurrence—led Vallecillo and the other crewmembers to believe that what they were doing was normal, standard, and not so dangerous that anyone believed it was necessary to exercise stop work authority. The lack of training and policies were thus a cause of Vallecillo's injuries.

McDermott is also vicariously liable for the negligent failure of the other crewmembers who were aware of the situation on top of the TBM to exercise stop work authority. McDermott argues that, even if the use of the crane was unsafe, Vallecillo bears all liability for any resulting injury because he decided to use the crane and he failed to exercise his stop work authority. Given the uncontrolled and unpredictable forces and behavior likely to result, use of the crane without removing personnel from the top of the TBM or tying off the sling or shackle was unsafe. But each of McDermott's other employees on DB50 also failed to exercise stop work authority and failed to use, or recommend using, other lines to secure the sling or shackle. Accordingly, the Court finds McDermott is liable for Vallecillo's injuries under the Jones Act and is responsible for the past and future medical expenses, economic damages, and general damages caused thereby.

McDermott argued at trial that Vallecillo failed to mitigate his economic damages because he never asked McDermott to transfer him to a light duty job after his treating physician told him he could work in such a role. There is no dispute that Vallecillo was rendered unable to work at all for some period, and at no point was able to return to his prior job making the wages he made previously. Vallecillo testified that, in his experience, there are no light duty positions in the offshore industry, and so he did not ask to transfer to such a role. He also testified that he did not seek employment elsewhere because he was still a McDermott employee, and his long tenure with the company combined with his receipt of maintenance and cure indicate he either did not wish to

leave the company or did not believe he could leave the company at the time. No evidence was offered, however, that McDermott offered light duty work which Vallecillo could have obtained or for which he would have been qualified, nor what his earning capacity might have been in such a position, whether with McDermott or elsewhere. In sum, McDermott has not proven its affirmative defense of failure to mitigate damages.

McDermott further argued that Vallecillo failed to mitigate his medical damages because he declined a second ankle surgery and did not obtain any injury-related treatment between December, 2016 and August, 2018. As to the surgery, Dr. Hebert testified that the surgery might have relieved some of Vallecillo's pain but would not have affected his ankle function, and that his symptoms ultimately improved such that the second surgery was not warranted. As to the alleged gap in treatment during 2017 and 2018, the record shows that Vallecillo was not treated by Dr. Lisecki during that time. However, McDermott does not dispute that Vallecillo's ankle surgery with Dr. Hebert occurred in January of 2017 and that his follow-up treatments with Dr. Hebert occurred through the rest of that year. Accordingly, McDermott has failed to prove Vallecillo failed to mitigate his medical damages.

McDermott is correct, however, that Vallecillo made the decision to use the crane, ordered the use of the crane, failed to request removal from the top of the TBM, and failed to secure the shackle or sling with additional lines. Each of these choices also led directly to his injury when the rigging collided with his safety lanyard. Vallecillo also failed to apprehend a risk that was apprehensible through the use of ordinary prudence, which was a cause of his injuries. As found above, McDermott's lack of training or policies regarding the use of cranes to free stuck shackles contributed to its employees' decisions that day. And while there were six crewmembers on DB50 at the time of the incident, the record shows that only four of them—Vallecillo, the two

unidentified riggers, and Bardwell—could directly observe what was happening on top of the TBM at the time. Accordingly, the Court finds Vallecillo 20% responsible for his injuries, and any recovery will be reduced accordingly.

**B.      Unseaworthiness.**

Given the Court's finding that McDermott's lack of training and policies regarding using a crane to free a stuck shackle constituted negligence under the Jones Act, it need not address the question of unseaworthiness. *See, e.g., Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 327 (5th Cir. 2020)(the Jones Act and general maritime law "largely provide for the same remedies" so "when we rule for a plaintiff on the issue of unseaworthiness, we ordinarily need not consider the question of Jones act negligence."

**C.      Damages.**

**1.   Past Medical Expenses.**

The parties stipulated that McDermott owed Vallecillo maintenance and cure and has already paid Vallecillo $58,039 in maintenance and $70,320.46 in cure. They further stipulated that Vallecillo has incurred an additional $10,648.59 in past medical costs that have not been paid but would be owed if the Court finds McDermott is liable for Vallecillo's injuries. Having found McDermott liable, the Court awards Vallecillo $10,648.59 in past medical costs.

**2.   Future Medical Expenses.**

The parties stipulated that the only future medical expenses at issue are the cost of a knee replacement that Dr. Lisecki opined definitively that Vallecillo will need at some point in his life. On cross-examination, Dr. Lisecki clarified that he does not currently recommend a knee replacement for Vallecillo. Dr. Lisecki also testified that he is not able to estimate a time frame for when a knee replacement would be necessary because other treatment options would need to be

addressed first. Trial Tr. Vol. I, pp. 151-52. However, Dr. Lisecki testified that Vallecillo's arthritis—called "traumatic arthritis" because it was caused by traumatic injury—will progress over time and cannot be remediated with medication. Dr. Lisecki did not qualify his opinion that the knee replacement will be a necessity with percentages over time but testified that it is a certainty given the condition of Vallecillo's knee and its causes. McDermott pointed out that there is no current estimation of when the surgery will be necessary, but did not offer any evidence rebutting Dr. Lisecki's testimony as to the certainty of its future necessity. Accordingly, the Court awards Vallecillo future medical costs of $75,971.70.

### 3. Lost Wages and Benefits.

The parties offered competing economic expert testimony regarding Vallecillo's past lost wages and benefits at trial. Vallecillo does not seek future lost wages or benefits because, even if he had not been injured, he would have retired prior to the time of trial.

Mr. John Theriot, Vallecillo's economic expert, calculated three totals representing options for Vallecillo's gross earnings at the time of the injury: (1) $665,924.00 (based on an "annualized wage for 2016," i.e., using the amount Vallecillo earned in 2016 prior to the incident to estimate the amount he would have earned throughout the year); (2) $638,402.00 (based on the amount Vallecillo earned in 2015, the last full year he worked prior to the injury); and (3) $641,033.00 (based on an average of the amounts Vallecillo earned from 2013 through 2015). Each calculation includes fringe benefits equal to 13.88% of gross wages and excludes taxes.

Each calculation also assumed a remaining work life of 5.9 years, based on Vallecillo's testimony that, prior to the injury, he had intended to retire at 67, which occurred prior to trial. Mr. Theriot did not take into account whether Vallecillo might have obtained light duty employment,

but assumed the injury totally disabled Vallecillo. Trial Tr. Vol. II, pp. 363-64, 368-74; Ex. J19; Ex. J40; Ex. J51; Ex. P4.

Mr. Dan Cliffe, McDermott's expert economist, opined that Vallecillo's work life expectancy was 4.9 years, rather than 5.9 years. Vallecillo's unrebutted testimony was that, prior to the injury, he intended to work until 67 years of age—i.e., 5.9 years after the injury—so that he would receive his maximum Social Security benefits after retiring. Trial Tr. Vol. II, p. 181. Mr. Cliffe indicated that he used 4.9 years to calculate lost wages based on statistical tables, which are more accurate because "plans change." Trial Tr. Vol. II, pp. 385-86; Ex. D5. Based on that estimation, Mr. Cliffe calculated four totals for Vallecillo's lost net wages: (1) $406,216.39 (assuming the injury rendered Vallecillo totally disabled), (2) $360,624.13 (assuming Vallecillo was able to return to work earning minimum wage as of November 27, 2017, the date Dr. Hebert opined Vallecillo's ankle reached maximum medical improvement), (3) $261,239.42 (assuming Vallecillo was able to return to work as of November 27, 2017 earning 50% of his pre-injury capacity), and (4) $130,247.02 (assuming Vallecillo was able to return to work after November 27, 2017 at full pre-injury earning capacity). Trial Tr. Vol. II, pp. 392-403; Ex. J52; Ex. D5.

Mr. Cliffe agreed, and McDermott did not dispute, that Vallecillo's fringe benefits could be calculated as 13.88% of the gross lost wages, but his calculation of past economic losses did not include those benefits. Trial Tr. Vol. II, pp. 394, 400-03. The Court held the record open after trial to allow the parties to provide supplemental reports from their economists detailing their calculations, including to allow Mr. Cliffe to calculate lost earnings that included fringe benefits valued at 13.88% of gross wages. Trial Tr. Vol. II, p. 409. However, Mr. Cliffe's post-trial submission indicates he calculated fringe benefits at 10.23% of gross wages rather than 13.88%, asserting that that is the number Mr. Theriot had used despite both experts' testimony at trial. Ex.

J52. Adding Mr. Cliffe's post-trial calculation of fringe benefits at the lower percentage yields total economic losses of: (1) $447,772.39 (Vallecillo unable to work after injury), (2) $397,516.13 (Vallecillo able to earn minimum wage after MMI), (3) $287,964.42 (Vallecillo able to earn 50% of pre-injury wages after MMI), and (4) $143,571.02 (Vallecillo able to return to full work after MMI).

Mr. Cliffe testified that he calculated Vallecillo's wage base, for purposes of calculating lost economic damages, by finding the average of Vallecillo's 2015 and 2016 earnings, minus business expenses Vallecillo claimed. Trial Tr. Vol. II, pp. 390-91. Similarly, one of Mr. Theriot's calculations was based on an average of Vallecillo's earnings over three years prior to his injury. Trial Tr. Vol. II, pp. 371-72. Using averages of earnings to calculate annual wages lost is disfavored in the Fifth Circuit if actual data are available; instead, Vallecillo's 2015 earnings represents an appropriate calculation of Vallecillo's gross earnings at the time of his injury. *See Martinez v. Offshore Specialty Fabricators, Inc.*, 481 Fed. Appx. 942, 949 (5th Cir.2012).

Given Vallecillo's unrebutted testimony that he intended to retire at age 67, the Court finds 5.9 years is a reasonable point basis to calculate Vallecillo's work life after his injury. Accordingly, the Court finds Vallecillo's total past economic damages amount to $546,265.00 in lost wages and $92,137.00 in lost fringe benefits, for a total award of $638,402.00

### 4. General Damages.

Vallecillo seeks a total of no less than $600,000 in past and future general damages, arguing that comparable cases value his injuries at $475,000 (knee) and $300,000 (ankle). ECF Nos. 103, 104. McDermott argues that Vallecillo is entitled to nothing because it is not liable, or alternatively, $20,000 for his knee injury and $15,000 for his ankle injury. ECF No. 102.

Prior awards should be adjusted for inflation. *Puga v. RCX Sols., Inc*., 922 F.3d 285, 297-98 (5th Cir. 2019).

### a. Knee Injury.

As to his knee injury, Vallecillo cites *Mouton v. Tug Ironworker*, 811 F.2d 946, 949 (5th Cir. 1987) to show that $175,000 ($479,000 in 2024 dollars) is an appropriate amount of general damages for injury to a knee requiring surgery, though there no future medical care was required. McDermott argues that it has already paid more than $128,000 in maintenance and cure to McDermott. However, $175,000 represented the entire jury award in *Mouton*, not only general damages, and the court there noted that there was testimony that the plaintiff had sustained economic losses of $376,184.

Vallecillo also cites *Courville v. Cardinal Wireline Specialists, Inc*., 775 F. Supp. 929 (W.D. La. 1991) to show that $175,000 ($391,000 in 2024 dollars) is an appropriate amount of general damages for an injury that required two knee surgeries. McDermott argues that the plaintiff in *Courville* was 29 years old when he was injured and was physically active for recreation, was left with 35-40% impairment of his entire right leg, and his disability came "during the prime of his life." *Id.* at 938.

McDermott argues that *Menard v. Audubon Ins. Group*, 2006-1192 (La. App. 3rd Cir. 3/14/07), 953 So.2d 187 shows that $20,000 is an appropriate general damages award for knee injury when there was a thirteen-month gap in treatment. But there, the plaintiff did not have surgery, or even a recommendation that surgery was necessary. Furthermore, as noted above, here there was no such gap in treatment, only a gap between Vallecillo's visits to Dr. Lisecki—in the meantime, Dr. Hebert performed Vallecillo's ankle surgery.

McDermott also argues that *Vargus v. Manson Gulf, LLC*, 439 F.Supp.3d 809 (E.D. La. 2020) shows that $19,000 in general damages is appropriate for a case involving a meniscus tear necessitating surgery. But in *Vargus*, the plaintiff's treating physician released him to "full-duty manual labor" after the surgery had healed, the plaintiff only required over-the-counter pain medication to manage any occasional knee pain, and therefore the jury awarded $19,000 in past general damages with nothing for future general damages. Here, Dr. Lisecki was clear that Vallecillo could not return to working in his previous role, and Vallecillo testified that his knee prevents him from squatting or standing for long periods.

In *Semien v. Parker Drilling Offshore USA LLC*, 179 F. Supp. 3d 687, 726 (W.D. La. 2016), the Plaintiff required two knee surgeries, but would not need a third, and the trial court awarded him $200,000 (roughly $263,000 in 2024 dollars) in total general damages. By contrast, Vallecillo has had one knee surgery and will eventually require a second, very painful surgery.

In *Matter of Parker Drilling Offshore USA, LLC*, No. 6:14-CV-00088, 2018 WL 1095850, at *7 (W.D. La. Feb. 27, 2018), the trial court awarded $125,000 (roughly $158,000 in 2024 dollars) to a plaintiff who had a knee surgery to repair a torn meniscus. The record there showed the plaintiff recovered well but had aggravated pre-injury arthritic changes, and aggravated pre-existing degenerative spine changes.

In *McGee v. Rowan Companies Inc*., No. CIV.A. 08-4715, 2009 WL 3150309, at *3 (E.D. La. Sept. 24, 2009), the plaintiff underwent two knee surgeries, suffered 50% permanent disability in the affected leg and 20% permanent disability in his whole body. The trial court awarded him $300,000 (roughly $436,000 in 2024 dollars) in total general damages.

In *In re: Diamond B Marine Servs., Inc*., No. 99-1346, 2001 WL 1164914, at *21 (E.D. La. Sept. 28, 2001), one of the plaintiffs had one arthroscopic knee surgery that "fully recovered"

and the trial court awarded him $35,000 (approximately $62,000 in 2024 dollars) in general damages related to his knee injury.

In *Crum v. United States*, No. CIV.A.99-2178, 2000 WL 943253, at *4 (E.D. La. July 6, 2000), the trial court awarded the plaintiff $18,000 in general damages for his torn meniscus, which would be increased to $30,000 (roughly $55,000 in 2024 dollars) if he elected to have the surgery.

Considering these cases, the Court finds Vallecillo is entitled to $300,000 in past and future general damages for his knee injury.

### b. Ankle Injury.

Vallecillo cites *Wynne v. Trotter*, 2010-0090 (La. App. 4 Cir. 6/30/10), 46 So. 3d 678, 685, *writ denied*, 2010-2050 (La. 11/12/10), 49 So. 3d 892, to show that general damages of $185,000 ($261,000 in 2024 dollars) is appropriate when a plaintiff suffered a heel fracture, had a permanent limp and could no longer run or stand for long periods, but no surgery. McDermott argues that Vallecillo has no limitations other than repetitive squatting. There was testimony at trial, however, that Vallecillo also cannot drive because his right leg becomes numb, that chores involving walking take him significant longer due to pain in his leg and foot, and that his leg occasionally cannot support his weight.

Vallecillo also cites *Baham v. Nabors Drilling USA*, LP, 721 F.Supp.2d 499, 524 (W.D. La.2010), *aff'd sub nom. Baham v. Nabors Offshore Corp.*, 449 Fed. Appx. 334 (5th Cir.2011) for the proposition that $250,000 ($352,000 in 2024 dollars) is appropriate for injury requiring two ankle surgeries and necessitating a third in the future. McDermott argues that *Baham* is not relevant because it is not a Jones Act case, and an FCE showed the plaintiff could not work at all, while Vallecillo was cleared to return to light duty work.

As to Vallecillo's ankle injury, McDermott cites *Koury v. Lanier Exp., Inc*., 528 So.2d 734 (La. App. 3rd 1988) to show that $12,000 (roughly $32,000 in 2024 dollars) is appropriate general damages for a fractured ankle that required two surgeries. There, the court found that the pain the plaintiff complained of at trial was due to two other ankle injuries she suffered after the initial surgery in response to the subject incident.

McDermott also points to *Reichenpfader v. Paccar, Inc*. 872 F. Supp. 328 (E.D. La. 1994) to show that $15,000 (roughly $32,000 in 2024 dollars) was an appropriate award for an ankle injury that required two surgeries to repair. However, the plaintiff there "enjoyed an 'ideal' recovery, and was able to return to work relatively soon after surgery," *Id.* at 331, which was not the case for Vallecillo.

In *Knight v. Kirby Offshore Marine Pac., L.L.C*., 983 F.3d 172, 181 (5th Cir. 2020), the court upheld a general damages award of $60,000 (roughly $73,000 in 2024 dollars) when the plaintiff underwent three reconstructive ankle surgeries and approximately 100 physical therapy sessions, and could no longer work as an offshore tankerman but could work as a shore tankerman. Importantly, here there was no evidence about what positions Vallecillo might have been able to do between MMI and retirement age. However, the court in *Knight* reviewed other similar cases in which ankle injuries requiring surgery gave rise to general damages awards of $35,000 (roughly $76,000 in 2024 dollars), $50,000 (roughly $70,000 in 2024 dollars), and $20,000 (roughly $31,000 in 2024 dollars).

Considering the above jurisprudence, the Court finds Vallecillo is entitled to an award of $70,000 for past and future general damages related to his ankle injury.

### 5.  Interest.

Prejudgment interest "is awarded almost as a matter of course in cases tried to a judge under general maritime principles." *Wyatt v. Penrod Drilling Co*., 735 F.2d 951, 955-56 (5th Cir. 1984); *see also Jauch v. Nautical Services, Inc.*, 470 F.3d 2017, 215 (5th Cir. 2006). In maritime cases, "the trial court has the discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable." *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp*., 71 F.3d 198, 204 (5th Cir. 1995). It is also within the trial court's discretion to select an equitable rate of prejudgment interest. *See e.g. Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1029-30 (5th Cir. 1986); *United States v. Cent. Gulf Lines, Inc*., 974 F.2d 621, 630 (5th Cir. 1992). In maritime cases in this Circuit, prejudgment interest is ordinarily awarded from the date of loss or injury. *Reeled Tubing at 1028; Kiwia v. M/V OSLO BULK* 9, 541 F.Supp.3d 696, 712 (E.D. La. 2021); *Bommarito v. Belle Chasse Marine Transportation*, 606 F.Supp.3d 304, 319 (E.D. La. 2022). Prejudgment interest, however, may not be awarded with respect to future damages. *Williams*, 750 F.2d at 491 (citing *Wyatt*, 735 F.2d at 956 n. 4).

Accordingly, the Court orders prejudgment interest on Vallecillo's past damages from the date of injury (April 20, 2016) to the date of judgment at the rate most recently quoted for one-year constant maturity treasury bills. Post-judgment interest is owed in accordance with 28 U.S.C. § 1961.

### IV.
#### DAMAGES AWARDED

Vallecillo is hereby awarded the following amounts:

| | |
|---|---|
| Future medical expenses: | $75,971.70 |
| Past lost wages: | $638,402.00 |

| | |
|---|---|
| Past and future general damages (knee injury): | $300,000.00 |
| Past and future general damages (ankle injury): | $70,000.00 |
| Total: | $1,084,373.70 |

As discussed above, Vallecillo was 20% responsible for his injury, reducing his total recovery to **$867,498.96**.


## IV.
### CONCLUSION

Considering the foregoing,

IT IS HEREBY ORDERED that McDermott pay to Plaintiff, Rene Vallecillo, **$867,498.96**, arising from the negligence of Defendant and its employees. Counsel for Plaintiff shall submit a proposed judgment, approved by counsel for Defendant, within fifteen (15) days of the date of this ruling. The judgment should award costs to Plaintiff, reduced commensurate with this Court's allocation of liability, and interest to the plaintiff as specified above.

THUS DONE AND SIGNED this 9th day of September, 2025.


_____
**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**